**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RON TOMA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 11 C 6766 |
| | ) |
| MOTLEY CRUE, INC. and RED, WHITE, | ) |
| & CRUE, INC., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

Before the court is the defendants' motion to dismiss the plaintiff's complaint or, in the alternative, to transfer this case to the Central District of California. For the reasons explained below, we grant the defendants' motion and dismiss this case without prejudice for lack of personal jurisdiction.

**BACKGROUND**

The plaintiff, Ron Toma, owns copyrights in certain photographs of members of the band Motley Crue taken by photographer Michael Pinter in 1981 (the "Pinter Images"). (Am. Compl. ¶ 1.) Defendant Motley Crue, Inc. ("MCI"), a California corporation with its principal place of business in Los Angeles, California, "conducts the business of the band Motley Crue." (Decl. of Nikki Sixx, attached to Defs.' Mot., ¶ 3 (hereinafter, "Sixx Decl.").) Red, White, & Crue, Inc. ("RWC"), which is also a

California corporation based in Los Angeles, "conducts and operates Motley Crue's touring and associated activities." (Id. at ¶ 5.) Toma accuses MCI and RWC of displaying at least one of the Pinter Images — the "Belt Buckle Image" — without his authorization.[1] (See Am. Compl. ¶ 14; see also id. at Ex. C (a still image taken from a video of a Motley Crue concert showing the Belt Buckle Image projected onto a large screen behind the band).[2] The Belt Buckle Image was used as the cover art for Motley Crue's first album, *Too Fast for Love*, and it was displayed during performances of the band's song of the same name on a recent concert tour. (See Sixx Decl. ¶ 12.) The defendants admit that they displayed the image during multiple performances, but deny that they displayed it during the band's performances in Illinois. (See id.; see also MCI's Resp. to Pl.'s Interrogatories, attached as Ex. A to Pl.'s Stmt. of Facts, at Resp. No. 1.) Toma previously sued MCI and two other parties (not including RWC) for copyright infringement in connection with the Pinter Images. See Toma v. MCI, et al., Case No. 08 CV 3479 (N.D. Ill.). The parties entered into a settlement agreement dismissing the lawsuit and granting MCI a license to use

_____

[1] The complaint also alleges that the defendants displayed the "Vince Neil Image," (see, e.g., Am. Compl. ¶ 14), but the parties' briefs discuss the Belt Buckle Image, only. (See, e.g., Pl.'s Resp. at 1 ("The Defendants improperly displayed Plaintiff's property, the 'Belt Buckle Image,' during concerts, in violation of Plaintiff's copyright and/or in breach of MCI's contract with Toma.").)

[2] The defendants contend, and Toma does not dispute, that the image attached to Toma's complaint shows the band's concert in Las Vegas, Nevada. (See Defs.' Mem. at 5-6.)

the Pinter Images for certain purposes. (Am. Compl. ¶ 2; <u>see also</u> Agreement of Settlement and Release, attached as Ex. 1 to Sixx Decl. (hereinafter, "Settlement Agreement").) Under the heading "Marketing of Musical Sound Recordings," the Settlement Agreement grants MCI the right to use the Belt Buckle Image to market the *Too Fast For Love* album. It goes on to state that, "[w]ithout limiting the generality of the foregoing" — <u>i.e.</u>, MCI's rights to use the image to advertise and sell *Too Fast for Love* — "it is understood that the foregoing includes the right of Motley Crue to include the album cover artwork in promotional materials relating to the band and performances of the band." (Settlement Agmt. ¶ 4.) The defendants contend that this language permits them to display the Belt Buckle Image during Motley Crue concerts. (<u>See</u> Defs.' Mem. at 13-14.) Toma argues that the Settlement Agreement only authorizes the defendants to use Belt Buckle Image *to promote* concerts. (<u>See</u> Pl.'s Resp. at 13.) He has filed a two-count complaint against the defendants asserting claims for copyright infringement (Count I) and breach of the Settlement Agreement (Count II).

## DISCUSSION

The defendants have moved to dismiss Toma's complaint pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6), or else transfer this case to the Central District of California pursuant to 28 U.S.C. § 1404(a).

## A.  Personal Jurisdiction

"The plaintiff has the burden of establishing personal jurisdiction, and where, as here, the issue is raised by a motion to dismiss and decided on the basis of written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts.  At this stage, therefore, we take as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff."  Tamburo v. Dworkin, 601 F.3d 693, 700 (7th Cir. 2010) (internal citation omitted).  "In a federal question case such as this one, a federal court has personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant." Mobile Anesthesiologists Chicago, LLC v. Anesthesia Associates of Houston Metroplex, P.A., 623 F.3d 440, 443 (7th Cir. 2010).  The Copyright Act does not authorize nationwide service of process. See Janmark, Inc. v. Reidy, 132 F.3d 1200, 1201 (7th Cir. 1997). So, the defendants are "amenable to service (and hence subject to personal jurisdiction) only if [they] could be served in Illinois under Illinois law."  Mobile Anesthesiologists, 623 F.3d at 443; see also Fed. R. Civ. P. 4(k)(1)(A).  Illinois's long-arm statute authorizes personal jurisdiction to the full extent permitted by the federal Constitution.  See 735 ILCS § 5/2-209(c).  Because our Court of Appeals has found "no operative difference between these

two constitutional limits," a single constitutional inquiry will suffice. <u>Mobile Anesthesiologists</u>, 623 F.3d at 443; <u>see also International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945).

Toma argues that the defendants are subject to both general and specific jurisdiction in Illinois. "A defendant with 'continuous and systematic' contacts with a state is subject to general jurisdiction there in any action, even if the action is unrelated to those contacts." <u>Tamburo</u>, 601 F.3d at 701 (quoting <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 416 (1984)). "Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." <u>Tamburo</u>, 601 F.3d at 702.

### 1. General Personal Jurisdiction

To be subject to general jurisdiction, the defendants' contacts with Illinois must be "so continuous and systematic as to render [the defendants] essentially at home in the forum." <u>Abelesz v. OTP Bank</u>, — F.3d —, 2012 WL 3590802, *12 (7th Cir. Aug. 22, 2012) (citing <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 131 S.Ct. 2846, 2851 (2011)) (internal quotation marks omitted). This standard "is demanding because the consequences can be severe: if a defendant is subject to general jurisdiction in a state, then it

may be called into court there to answer for any alleged wrong, committed in any place, no matter how unrelated to the defendant's contacts with the forum." <u>uBID, Inc. v. GoDaddy Group, Inc.</u>, 623 F.3d 421, 426 (7th Cir. 2010).[3] The defendants emphasize that they do not have a permanent physical or legal presence in Illinois. (<u>See</u> Sixx Decl. ¶¶ 4, 6 (stating, among other things, that the defendants are not registered to do business in Illinois and do not own any assets here). Toma responds that the defendants have numerous other contacts with the state: (1) Motley Crue concerts in Illinois (<u>see</u> Sixx Decl. ¶ 7; Pl.'s Stmt. of Facts ¶ 22; Decl. of Ron Toma, attached as Ex. N to Pl.'s Stmt. of Facts, ¶ 2 (hereinafter, "Toma Decl."); (2) relationships with Illinois vendors supporting the band's promotional and touring activities (<u>see</u> Exs. C and D to Pl.'s Stmt. of Facts; <u>see also</u> Toma Decl. ¶ 10); (3) Motley Crue album sales in Illinois over the past 30 years (Pl.'s Stmt. of Facts ¶ 8); (4) website-related services purchased by MCI between 1994 and 2004 from an Illinois resident named Shaun Pollitt ("a/k/a Interactive Marketing Design") (<u>see</u> Ex. E to Pl.'s Stmt. of Facts); (5) activities in Illinois related to Toma's 2008 lawsuit against MCI, including the Settlement Agreement negotiations (<u>see</u> Pl.'s Stmt. of Facts ¶¶ 12-17); and (6) merchandise offered for sale to Illinois consumers (among others)

---

[3]/ Suppose that Motley Crue's tour bus was involved in a traffic accident in California. If the defendants are subject to general jurisdiction in Illinois, that means they could be haled into an Illinois court to defend a personal injury lawsuit arising from that accident.

through the band's website and third-party websites[4] (see Exs. K
and L to Pl's Stmt. of Facts).

These contacts are extensive in the aggregate, but they are
insufficient to meet the demanding standard required to subject the
defendants to general jurisdiction in Illinois. See Abelesz, 2012
WL 3590802, *12 ("The proper inquiry is not, as plaintiff's
suggest, whether a defendant's contacts 'in the aggregate are
extensive.' The issue under the Due Process Clauses of the Fifth
and Fourteenth Amendments is whether the contacts 'are so
"continuous and systematic" as to render [defendants] essentially
at home in the forum.'") (quoting Goodyear, 131 S.Ct. at 2851).
The cited examples of MCI's contacts with Illinois-based vendors
are sporadic: Toma specifically identifies only seven such vendors
spanning a period of almost 30 years.[5] The websites, and the
lawsuits that Toma has filed in this District, add little to the
general-jurisdiction analysis. There is no evidence indicating how
much revenue the defendants generate from Internet sales to

---

[4] Toma sued MCI again in 2011 in connection with merchandise allegedly
offered for sale on websites operated by Live Nation Merchandise, Inc. (See
Pl.'s Stmt. of Facts ¶¶ 26-28); see also Toma v. MCI et al., Case No. 11-CV-345
(N.D. Ill.). In that lawsuit, Toma alleged on information and belief that MCI
"induced" Live Nation to infringe Toma's copyrights. See Compl., Toma v. MCI et
al., Case No. 11-CV-345 (N.D. Ill.), Dkt. 1, ¶ 2. The parties settled that
lawsuit before MCI filed its appearance. (See Defs.' Mem. at 12 n.1; Pl.'s Stmt.
of Facts ¶ 27.)

[5] The most recent example that Toma cites is a contract for
transportation and moving services from 2009, two years prior to this lawsuit.
(See Toma Decl. ¶ 10.) The other cited examples are significantly older. (See
id. (vendor contracts dating from 1983, 1984, "the late 1990s," 1997, and 2005;
see also Pl.'s Stmt. of Fact ¶ 9 (indicating that the band's business
relationship with Pollitt ended in 2004).)

Illinois residents, nor is there any evidence that the defendants specifically target Illinois residents for such sales. <u>Cf.</u> <u>be2 LLC</u> <u>v. Ivanov</u>, 642 F.3d 555, 558 (7th Cir. 2011) ("If the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution."). As for the 2008 and 2011 lawsuits, Toma unilaterally chose Illinois — his home state — as the forum for those suits. Toma emphasizes that his standing to sue MCI is based upon his purchase of the Pinter Images from Pollitt in Illinois, and that Pollitt was MCI's "agent." The sale was advertised on the website that Pollitt maintained for MCI, (<u>see</u> Ex. F to Pl.'s Stmt. of Facts (images of the Motley Crue website in 2004), but that does not mean that Pollitt was acting as MCI's agent in that particular transaction. In fact, the record shows that MCI was *not* a party to that sale: Pollitt purchased the images from Pinter and later resold them to Toma.[6]

The band's concert performances and record sales in Illinois are more pertinent, but ultimately insufficient to support general

---

[6] (<u>See</u> Transfer of Ownership Stmt., dated Mar. 24, 2002, attached as part of Ex. B to Settlement Agreement (stating that Pinter was transferring his rights in the images to Pollitt); Transfer of Ownership Stmt., dated Oct. 5, 2004, attached as part of Ex. B to Settlement Agreement (stating that Pollitt was transferring to Toma his rights in the images "as given to [Pollitt] by Michael Pinter"); <u>see also</u> Transfer of Copyright and Causes of Action, dated April 30, 2008, attached as part of Ex. B to Settlement Agreement (document executed by Pinter transferring to Toma any rights Pinter may have retained in the images); Ex. F at 3 (message board post by Pollitt stating that he was auctioning his own Motley Crue memorabilia, including the Pinter Images).)

jurisdiction. Based on the evidence in the record, it appears that over the last fifteen years Motley Crue has averaged one concert in Illinois every 18 months or so. (See Sixx Decl. ¶ 7 (stating that the band performed three times in Illinois in 2010 and 2011); Pl.'s Stmt. of Facts ¶ 22 (stating that the band was scheduled to perform in Tinley Park, Illinois on September 7, 2012); Toma Decl. ¶ 2 (stating that he attended Motley Crue concerts in Illinois in 1997, 1998, 2000, 2005, and 2006).) Toma has not cited any sales figures, but we will assume for purposes of the defendants' motion that the band's concerts and records sales in Illinois generate significant revenues. But in uBid, the defendant had "hundreds of thousands" of Illinois customers generating "many millions of dollars of revenue," and still the Court concluded that the defendant's contacts with Illinois were insufficient to support general jurisdiction. uBid, 623 F.3d at 424. We conclude that the defendants' contacts with Illinois are not sufficiently "continuous and systematic" to require them to answer in an Illinois court for conduct totally unrelated to their contacts with the state. See id.

## 2. Specific Personal Jurisdiction

Toma does not contest the defendants' assertion that they did not display the Belt Buckle Image during Motley Crue's recent Illinois concerts. (See Sixx Decl. ¶ 12 (stating that the Belt Buckle Image was not displayed during Motley Crue's Illinois performances in 2011); see also MCI's Resp. to Toma's

Interrogatories at No. 1 (listing locations of concerts where the
Belt Buckle Image was displayed, not including Illinois).)
Nevertheless, Toma argues that the defendants are subject to
personal jurisdiction here because his claim arises out of an
agreement "negotiated, in part, in Illinois and for which a pending
matter in the N.D. Ill. was dismissed." (Pl.'s Stmt. of Facts ¶
17.)[7] "[A]n out-of-state party's contract with an in-state party
is alone not enough to establish the requisite minimum contacts."
RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1277 (7th Cir.
1997) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478
(1985)). Instead, "'prior negotiations and contemplated future
consequences, along with the terms of the contract and the parties'
actual course of dealing' must indicate the purposeful availment
that makes litigating in the forum state foreseeable to the
defendant." Id. (quoting Burger King, 471 U.S. at 479). This is
not a case where the defendants deliberately sought out a business
relationship with an Illinois resident. Cf. Citadel Group Ltd. v.
Washington Regional Medical Center, 536 F.3d 757, 759 (7th Cir.
2008). MCI was compelled by law to respond to a lawsuit that Toma

---

[7] Toma has not cited any evidence indicating that the parties met
face-to-face in Illinois to negotiate the Settlement Agreement. He cites a
"Status Conference Statement" that the defendants filed in the 2008 lawsuit in
support of his contention that the Settlement Agreement was negotiated "in part"
in Illinois. However, that document merely states that the parties had "been
exchanging draft written agreements in an attempt to work out the fine points and
the final language." (See Defs.' Status Conf. Stmt., attached as Ex. H to Pl.'s
Resp., at 1.) Elsewhere, Toma states that the parties "engaged in extensive
telephonic and electronic discussions in Illinois and California." (Pl.'s Stmt.
of Facts ¶ 15.) It appears, then, that the parties negotiated primarily (and
possibly exclusively) through electronic means from their respective locations.

chose to file Illinois.  It is true, as Toma points out, that the parties agreed that the Settlement Agreement would be governed by Illinois law.  (See Settlement Agreement ¶ 25 ("This Agreement shall be construed according to the laws of the State of Illinois and the United States of America.").)  This clause is a factor supporting personal jurisdiction in Illinois, but it is not dispositive.  See Sungard Data Systems, Inc. v. Central Parking Corp., 214 F.Supp.2d 879, 882 (N.D. Ill. 2002) ("The choice of law provision is also only one factor to consider in the minimum contacts analysis, and standing alone, it is insufficient to confer personal jurisdiction.").  The Sungard court concluded that the defendant was not subject to personal jurisdiction in Illinois despite a choice-of-law provision providing that the parties' agreement would be governed by Illinois law.  Id. at 882-83.  And in that case, the parties anticipated a continuing business relationship with at least a tenuous connection to Illinois.  See id. at 883.  The Settlement Agreement does not require or specifically contemplate any action by the parties in Illinois.

Toma also argues that we should exercise specific jurisdiction over the defendants because he resides in Illinois and the defendants' actions were "directed at [his] interests."  (Pl.'s Resp. at 5; see also id. at 4 ("The Defendants purposely availed themselves of the benefits of Illinois . . . by infringing the copyright of a known Illinois resident.").)  Toma appears to be invoking the "express aiming" test that the Supreme Court announced

in _Calder v. Jones_, 465 U.S. 783 (1984), but he has not cited

_Calder_ or any other pertinent case law.  The plaintiff in _Calder_

alleged that she was libeled by a newspaper article written and

edited by the defendants in Florida.  _Calder_, 465 U.S. at 783.  She

sued the defendants in California, where she lived and worked, and

where the article was circulated (among other places). _Id._

Although the defendants' other contacts with California were

negligible, the Supreme Court concluded that they were subject to

personal jurisdiction in California:

> [Petitioners'] intentional, and allegedly tortious,
> actions were expressly aimed at California. Petitioner
> South wrote and petitioner Calder edited an article that
> they knew would have a potentially devastating impact
> upon respondent. And they knew that the brunt of the
> injury would be felt by respondent in the State in which
> she lives and works and in which the National Enquirer
> has its largest circulation. Under the circumstances,
> petitioners must "reasonably anticipate being haled into
> court there" to answer for the truth of the statements
> made in their article.

_Id._ at 789-90 (quoting _World-Wide Volkswagen Corp. v. Woodson_, 444

U.S. 286, 297 (1980)).  Our Court of Appeals has required

plaintiffs to establish "something more" than an injury in the

forum state to support personal jurisdiction under _Calder_: the

plaintiff must also establish "tortious conduct _specifically_

_directed_ at the forum, making the forum the focal point of the

tort." _Tamburo_, 601 F.3d at 706 (emphasis added).  The "focal

point" of the libelous article in _Calder_ was the location where the

subject lived and worked. _Calder_, 465 U.S. at 789-90.  In _Tamburo_,

the plaintiff accused the defendants of publishing false and

defamatory statements on public websites and "blast emails."
Tamburo, 601 F.3d at 706. "[A]lthough they acted from points
outside the forum state, these defendants specifically aimed their
tortious conduct at Tamburo and his business in Illinois with the
knowledge that he lived, worked, and would suffer the 'brunt of the
injury' there." Id. (quoting Calder, 465 U.S. at 789–90). The
defendants displayed the Belt Buckle Image during Motley Crue
concerts outside Illinois. As far as the record reveals, the
defendants did not rebroadcast those images in Illinois or
otherwise "aim" their allegedly infringing conduct at Toma in the
sense that Tamburo requires. The most we can say is that the
defendants displayed the Belt Buckle Image with the knowledge that
the copyright holder lives in Illinois. That is not enough. See
Mobile Anesthesiologists, 623 F.3d at 447 ("The cases that have
found express aiming have all relied on evidence beyond the
plaintiff's mere residence in the forum state."); see also Narco
Avionics, Inc. v. Sportsman's Market, Inc., 792 F.Supp. 398, 408
(E.D.Pa. 1992) ("There is an important distinction between
intentional activity which foreseeably causes injury in the forum
and intentional acts specifically targeted at the forum."). We
conclude that the defendants' actions outside of Illinois did not
subject them to personal jurisdiction in this state under Calder
and its progeny.

Finally, Toma suggests that we should exercise jurisdiction
over the defendants because MCI did not object to personal

jurisdiction in the 2008 case. (<u>See</u> Pl.'s Resp. at 4.) Toma
appears to be invoking the judicial-estoppel doctrine, <u>see</u> <u>New
Hampshire v. Maine</u>, 532 U.S. 742, 749-55 (2001), but he has not
attempted to show that the doctrine applies here. <u>See</u> <u>United
States v. Tockes</u>, 530 F.3d 628, 633 (7th Cir. 2008) ("Unsupported
and undeveloped arguments . . . are considered waived."). In any
case, it is apparent that judicial estoppel is unwarranted. Courts
consider several factors when deciding whether judicial estoppel is
appropriate: (1) "a party's later position must be clearly
inconsistent with its earlier position;" (2) "the party has
succeeded in persuading a court to accept that party's earlier
position, so that judicial acceptance of an inconsistent position
in a later proceeding would create the perception that either the
first or second court was misled;" and (3) "the party seeking to
assert an inconsistent position would derive an unfair advantage or
impose an unfair detriment on the opposing party if not estopped."
<u>New Hampshire</u>, 532 U.S. at 750-51 (citation and internal quotation
marks omitted); <u>see also</u> <u>In re Knight-Celotex, LLC</u>, — F.3d —, 2012
WL 3871526, *5 (7th Cir. Sept. 5, 2012) ("These factors are not a
rigid test that must be applied every time the issue of judicial
estoppel is raised, but rather are general guideposts that must be
considered in the context of all the relevant equities in any given
case."). MCI's participation in the earlier lawsuit is not
"clearly inconsistent" with its argument that we lack personal
jurisdiction over the defendants in this case. MCI might have

chosen to waive its objections to jurisdiction in the earlier case for reasons unrelated to the merits of the defense, or else the nature of Toma's claims in that lawsuit may have made specific jurisdiction seem more appropriate. Moreover, MCI did not persuade the court in the 2008 case that it was subject to personal jurisdiction such that it would be unfair for it to change tack now. It merely elected not to raise a potential defense. In sum, we conclude that MCI's participation in the 2008 lawsuit does not estop the defendants from raising their jurisdictional defense in this case.[8]

## CONCLUSION

The defendants' motion to dismiss [30] is granted. We conclude that the plaintiff has not satisfied his burden to show that the defendants are subject to personal jurisdiction. Accordingly, this case is dismissed without prejudice to the plaintiff refiling his claims in another jurisdiction.


DATE:      October 9, 2012


ENTER:     _____
           John F. Grady, United States District Judge

---

[8] Because we have concluded that Toma has not satisfied his burden to show that the defendants are subject to personal jurisdiction, we do not reach the defendants' § 1404(a) and Rule 12(b)(6) arguments.